# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT A. ROPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 3628** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert A. Roper seeks judicial review of a final decision by the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.[1] For the reasons discussed herein, the plaintiff's motion to remand is granted [dkt. 15].

## I.  PROCEDURAL HISTORY

On May 14, 2007 plaintiff filed an application for DIB and a period of disability beginning on October 31, 2006.[2] He alleged constant pain due to a ruptured disk at L5, which in turn has limited his ability to work because his back locks up three to four times a day preventing him from any further mobility and any standing for longer than 10 minutes.[3] Plaintiff's claim was denied on August 31, 2007.[4] Plaintiff then filed a request for reconsideration within the permitted 60 days following the Notice of Disapproved Claim, which was again denied on November 30, 2007.[5] On

---

[1]42 U.S.C. §§416(i), 423.
[2]R. at 149.
[3]R. at 141.
[4]R. at 79.
[5]R. at 79, 84.

January 4, 2008, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[6]

Plaintiff's request was granted and a hearing took place before ALJ Mary Ann Poulose on October 8, 2008 in Orland Park, Illinois.[7] Also appearing at the hearing was an impartial vocational expert ("VE"), Michelle M. Peters.[8] Following the hearing the ALJ issued an unfavorable decision, finding plaintiff not disabled at anytime from October 31, 2006 through the date of the decision, October 29, 2009.[9] Plaintiff then filed a request for review of the ALJ's decision with the Office of Social Security Administration Appeals Council ("Appeals Council") on December 9, 2009.[10] The Appeals Council denied plaintiff's request for review on April 15, 2011.[11] Thus, the ALJ's October 29, 2009 decision stands as the final decision of the Commissioner.[12] Plaintiff filed this action on December 22, 2011.

## II. STATEMENT OF FACTS

The facts set forth under this subsection provide a brief review of the plaintiff's background and the events that led to his application for DIB and a period of disability. They are derived from the medical record, which the ALJ reviewed at the hearing on October 8, 2008 and considered in its entirety when rendering her decision on October 29, 2009.

Plaintiff was born on May 9, 1979, making him thirty years of age on the date the ALJ issued her final decision.[13] He completed high school through the twelfth grade in 1997.[14] Between May 1996 and May 1999, he held four different jobs which include the following stores/companies (most

---

[6]R. at 77.
[7]R. at 94.
[8]R. at 110.
[9]R. at 10.
[10]R. at 28.
[11]R. at 1.
[12]Id.
[13]R. at 149.
[14]R. at 147.

recent first): Toyota Tshusho; Menards; Joliet Cabinets; and Brown's Chicken.[15]  Plaintiff worked

at Toyota Tshusho as a forklift operator in a warehouse from May 1999 to approximately October

2006.[16] Plaintiff drove a forklift to load and unload trucks, stacked pallets by hand for balancing and

bracing, along with some paperwork.[17]  At the Menards store, plaintiff worked  as a forklift operator

in a warehouse from may 1998 to May 1999.[18]  Plaintiff would restock wood in the lumbar yard and

help customers load their vehicles, and also drove the forklift to load commercial Menards' trucks.[19]

At Joliet Cabinet, plaintiff worked as a cabinet maker in a warehouse from June 1997 to April

1998.[20] Plaintiff would dry fit cabinets, lift wood used in cabinet production that weighed fifty or

more pounds and carry it approximately 25 feet for 6 hours a day.[21]  At Brown's Chicken, plaintiff

worked as a cook from May 1996 to May 1997.[22]  Plaintiff cooked and handled the cash register.[23]

Plaintiff also lifted and carried bags of chicken numerous times a day.[24]

On his first disability report dated May 14, 2007, plaintiff indicated that he began

experiencing back pain in October 31, 2006.[25]  A review of plaintiff's medical records, prior to his

application for disability on May 14, 2007,  is critical to set the framework for his overall medical

history.

---

[15]R. at 155.
[16]R. at 155, 124.
[17]R. at 156.
[18]R. at 155.
[19]R. at 159.
[20]R. at 155.
[21]R. at 158.
[22]R. at 155.
[23]R. at 157.
[24]*Id.*
[25]R. at 124.

## A.    Medical record: pre-disability application

On June 28, 2004 plaintiff first visited Dushyant Patel, M.D., at Joliet Open MRI, L.L.C. regarding lower back pains.[26]  An MRI revealed a slight anterior displacement of L5 over S1 but no spondylolysis and a questionable small disc protrusion at L3-L4.[27]  From June 12, 2006 to February 5, 2007, plaintiff visited Maimoona S. Aijaz, M.D., his treating physician, 19 times for right leg swelling, back pain, and his obesity problem.[28] Directly related to these physical problems, Dr. Aijaz excused plaintiff from work many times for days or weeks on end throughout this time period.[29]  To address these three concerns, plaintiff visited numerous specialists to discuss potential remedies.

In particular, on July 17, 2006, plaintiff consulted with Christopher Joyce, M.D. for laparoscopic gastric bypass surgery to address his obesity problem.[30]  A week later on July 24, 2006, plaintiff visited Ram Pankaj, M.D., F.A.A.O.S., due to right leg swelling and poison oak on both legs.[31] Dr. Pankaj noted that plaintiff's weight was the major issue causing the swelling and varicose veins in both legs.[32]  As a result of several consultations and recommendations from various doctors, on December 11, 2006 plaintiff underwent bariatric surgery to resolve his morbid obesity at Silver Cross Hospital under Dr. Joyce's care.[33]  At the time of the surgery, plaintiff was 6'2", 410.5 pounds, with a BMI of 52.7.[34]

---

[26]R. at 211.

[27]*Id.* "Spondylothesis" means the breaking down or degeneration of a vertebra. *See Attorney's Illustrated Medical Dictionary*, (1997) p. S58.

[28]R. at 244-272.

[29]*Id.*

[30]R. at 212. "Laparoscopic gastric bypass" means abdominal incision to shrink the stomach. *See Attorney's Illustrated Medical Dictionary*, (1997) p. G6.

[31]R. at 217. "Poison oak" means skin eruption and inflammation. *See Attorney's Illustrated Medical Dictionary*, (1997) p. P56.

[32]*Id.* "Varicose" means abnormally dilated and tortuous veins. *See Attorney's Illustrated Medical Dictionary*, (1997) p. V5.

[33]R. at 296. "Bariatric" means the prevention of obesity. *See Attorney's Illustrated Medical Dictionary*, (1997) p. B5.

[34]*Id.*

On January 15, 2007, following his bariatric surgery, plaintiff underwent an MRI at Future Diagnostics Group and Jon R. Jester, M.D., found the following impressions: Grade I L5-S1 spondylothesis with facet arthropathy and possible left chronic spondylothesis and very shallow, central, and slightly left protrusion of the L3-L4 disc primarily indenting the epidural fat.[35] One week later on January 23, 2007, plaintiff received a progress evaluation from Dr. Pankaj where he was diagnosed with lower back pain secondary to spondylothesis and facet arthropathy.[36] Later that month on January 31, 2007, plaintiff again met with Dr. Pankaj to discuss pain in his left ankle, which was found to be what is called osteochondritis disseccans, which is the separation of the ankle bone and the cartilage.[37]

Plaintiff was prescribed certain medications prior to and at the time of filing his DIB application for his lower back problems. Specifically, plaintiff was prescribed Ibuprohen/200mg 2-QID and Tylenol/500mg 1-BID by Dr. Aijaz for pain.[38] The ensuing section details plaintiff's medical records from the time of his DIB application submission on May 14, 2007 up until the ALJ hearing on October 8, 2008.

**B.    Medical record: disability application through ALJ hearing**

Plaintiff filed for disability on May 14, 2007.[39] From April 16, 2007 to October 30, 2007, plaintiff made fourteen visits to Ronald R. Pieroni, D.P.M., at Bolingbrook Foot and Ankle Center, P.C. to discuss options regarding the pain in his left ankle.[40] Dr. Pieroni diagnosed plaintiff as

---

[35]R. at 231.“Arthopathy” means a disease of the joint. *See Attorney's Illustrated Medical Dictionary*, (1997) p. A77.
[36]R. at 219.
[37]R. at 220. “Osteochondritis disseccans” means the inflamation and gradual separation of both bone and its cartilage. *See Attorney's Illustrated Medical Dictionary*, (1997) p. O20.
[38]R. at 167.
[39]R. at 149.
[40]R. at 348.

having a rupture of the "anterior talofibular and calcaneal (or heel bone) fibular ligaments" in his left ankle joint.[41] The physical treatment appeared to be working through June 2007 but the pain in his left ankle flared back up in October of 2007.[42] Plaintiff, with Dr. Pieroni's recommendation, requested to have surgery on his left ankle, which he had on October 19, 2007 at Loyola Ambulatory Surgery Center at Oakbrook.[43]

On July 16, 2007, plaintiff had a cardiology consultation at Provena Saint Joseph Medical Center with R. Elgar, M.D., and no serious cardiac issues outside of aymptomatic sinus bradycardia, which is the slowness in heart rate, were detected by the electrocardiogram ("ECG").[44]

On August 11, 2007, plaintiff visited Gozi Health Services for a consultation by ChukwuEmeka F. Ezike, M.D., M.P.H., who was given an "internal medicine consultative examination" form by the Bureau of Disability Determination Services to examine plaintiff's medical status.[45] There, Dr. Ezike found that plaintiff had lower back pain.[46]

On two occasions in January and February of 2008, plaintiff visited Rober T. Semba, M.D., about his chronic back and leg problems.[47] Dr. Semba prescribed Neurontin but it did not seem to work on a consistent basis and plaintiff was referred to a spine surgeon.[48] Upon referral, on March 19, 2008, plaintiff visited James B. Boscardin, M.D., regarding potential surgery but was given steroids as a first option (i.e. Depo-Medrol 80 and 6 of Decadron) for his lower back pain.[49] At the

---

[41]*Id.* "Talar" means relating to the ankle bone. *See Attorney's Illustrated Medical Dictionary*, (1997) p. S58, p. T2.

[42]R. at 351-352.

[43]R. at 352, 354.

[44]R. at 329, 332. "Bradycardia" means the excessive slowness in the action of the heart. *See Attorney's Illustrated Medical Dictionary*, (1997) p. B32.

[45]R. at 337.

[46]R. at 339.

[47]R. at 475.

[48]R. at 475.

[49]R. at 477.

follow up consultation on March 26, 2008, Dr. Boscardin found the following from an EMG and MRI exams regarding the plaintiff's lower back: 1) peripheral neuropathy is apparent; 2) there are mechanical issues with his lower back; 3) there is Grade I spondylothesis at L5-S1; 4) there are some mild changes at L4-5; 5) there is a left protrusion at L3-4.[50]  Dr. Boscardin determined that plaintiff did not need surgery or epidurals and recommended that plaintiff return to therapy to work on the core muscles surrounding the spinal tissue.[51]  Finally, if plaintiff completed a thorough physical therapy regimen, Dr. Boacardin determined that he would be able to return to the workforce.[52]

From June 16, 2008 to October 3, 2008 plaintiff visited Dr. Aijaz six times regarding difficulty breathing and in her notes Dr. Aijaz suspected dyspnea, or labored breathing.[53]  October 1, 2008 plaintiff was referred by Dr. Aijaz to have a echocardiogram at Provena Saint Joseph Medical Center where Danielle P. DeGirolami, M.D., found the left ventricle had a lower overall reduction in systolic function, essentially concluding plaintiff had dyspnea in the left ventricle.[54]

Plaintiff was prescribed certain medication after filing his DIB application for his lower back problems.  Specifically, plaintiff was prescribed Vicodin by Dr. Aijaz for lower back pain.[55]  The Vicodin had the following side effects: fatigue, drowsiness and lightheadedness.[56]  The ALJ hearing took place on October 8, 2008 and confirmed plaintiff's previously raised medical issues.[57]

---

[50]R. at 478. "Neuropathy" is defined as any disease of the nerve. *See Attorney's Illustrated Medical Dictionary*, (1997) p. N34.
[51]*Id.*
[52]*Id.*
[53]R. at 399-410. "Dyspnea" is defined as difficult or labored breathing. *See Attorney's Illustrated Medical Dictionary*, (1997) p. D53.
[54]R. at 401.
[55]R. at 188.
[56]R. at 188.
[57]R. at 36.

## C.     October 8, 2008 ALJ hearing

Plaintiff's hearing before the Social Security Administration took place on October 8, 2008, in Orland Park, Illinois.[58]  Plaintiff appeared in person and was represented by his attorney, John Horn.  A VE, Michelle Peters, testified as well.[59]  At the hearing, plaintiff responded to questions from the ALJ.  He first discussed his living situation and educational background, noting that he lived with his grandmother, fiancé, and two children aged 12 and 5 at the time, and had no more than a high school education.[60]  The ALJ then asked him about his work situation, to which the plaintiff explained that he has not worked since October of 2006.[61]  When the ALJ asked why he had left this job, plaintiff responded that it was due to medical reasons, which prohibited him from walking.[62]  He explained that his previous job was as a forklift operator, performing duties that included loading and unloading commercial trucks, shipping and receiving.[63]  Occasionally, plaintiff would have to lift boxes that weighed approximately fifty pounds.[64]

The ALJ then began to ask questions regarding why he has not returned to work since October of 2006.  Plaintiff stated that he was told by his treating physician, Dr. Aijaz, not to go back to work until he consulted a back surgeon.[65]  It was not until January of 2007 that he was released to go back to work in a sedentary-like position, only after having gastric bypass surgery in December of 2006.[66]  The plaintiff explained that not more than a week after he was released to go back to

---

[58]*Id.*
[59]*Id.*
[60]R. at 41.
[61]*Id.*
[62]*Id.*
[63]*Id.*
[64]R. at 42.
[65]R. at 43.
[66]*Id.*

work he could not walk and it was then that he began physical therapy for his back.[67]  He then started having problems with his left ankle due to swelling and constant pain, so he had surgery on it in October 2007 by a specialist in Bolingbrook, Illinois.[68]  The surgery did not alleviate the swelling and now the problem had reached both ankles.[69]  Plaintiff then explained that due to a breathing issue, he had an echo on his heart and it was found that his heart was only functioning at forty percent.[70]  Plaintiff then mentioned that he was insured with Medicaid and that his fiancé was the only income generator in his household.[71]

The ALJ then began asking general questions regarding plaintiff's daily routine.[72]  The plaintiff explained that he wakes up at 6:30 a.m., gets his kids ready for school, drives his daughter to school, and then comes back home and watches television for the remainder of the day.[73]  He explained that he naps for an hour and a half to two hours in the middle of the day due to the one to three Vicodin (per day) he takes for the pain in his back.[74]  He stated that he never does any of the following household chores: mowing the lawn, taking out the garbage, grocery shopping, sweeping or vacuuming.[75]  He rarely visits family, never uses the stairs, and at times has trouble balancing himself.[76]  It usually takes him twenty to thirty minutes to loosen up his back in the mornings because his back is so stiff.[77]  He can only stand for about thirty minutes before he has to sit, and he

---

[67]Id.
[68]R. at 43,44.
[69]R. at 44.
[70]Id.
[71]R. at 45.
[72]Id.
[73]R. at 45, 46.
[74]R. at 46.
[75]Id.
[76]R. at 48.
[77]R. at 49.

can only sit for forty to forty-five minutes at a time.[78]  Plaintiff also explained that both his ankles

swell to the point where he needs to elevate his legs and take water pills to reduce the swelling.[79]

Plaintiff also has problems breathing due to heart problems, he cannot extend his arms, and has more

pain in his lower back when the weather is cold.[80]

The VE, Ms. Michele Peters, testified next.  According to the Dictionary of Occupational

Titles ("DOT"), she categorized plaintiff's prior forklift operator position as semi-skilled, low and

semi-skilled in nature, and medium in physical demand.[81]  The ALJ then asked the VE whether a

person of plaintiff's age, education, work experience and skill set, limited to light work sit-stand

option, only occasionally reaching overhead, avoiding exposure to cold, could  perform any job

similar to the plaintiff's previous position.[82]  The VE said such a person could find work in the

Chicago metropolitan area.[83]  These jobs would include 2500 assembly positions, 1800 packaging

type positions, and 1500 inspection positions.[84]  Then the plaintiff's attorney asked the VE whether

a person could hold any of the aforementioned positions if that person were off task an hour and a

half to two hours a day.[85]  The VE testified that with such off task hours, plaintiff would be

precluded from work pursuant to the minimum eighty-two percent standard according to the

Department of Labor.[86]

Following the ALJ hearing, plaintiff had a series of medical set backs that need to be cited

for the record.  The following section details plaintiff's medical record from the time after the ALJ

---

[78]*Id.*
[79]R.at 50.
[80]R. 52, 53.
[81]R. at 62.
[82]*Id.*
[83]R. at 63.
[84]*Id.*
[85]R. at 64.
[86]*Id.*

hearing on October 8, 2008 through the ALJ decision on October 29, 2009.

**D.      Medical record: ALJ hearing through ALJ decision**

Following the ALJ hearing, on October 17, 2008, plaintiff visited Heartland Cardiovascular Center, L.L.C. because of an abnormal heart echo and shortness of breath.[87]   There, Kirkkeith Lertsburapa, M.D., determined that plaintiff did in fact have chronic dyspnea, confirming Dr. Aijaz's mid-September suspicions.[88]   Moreover, Dr. Lertsburapa also noted that plaintiff had a "depressed left ventricular ejection fraction," or the hypertensive heart issues, at approximately forty-five percent, which can lead to a heart attack.[89]   On several follow-up consultations, Dr. Lertsburapa determined that cardiovascular surgery was needed to replace an aortic valve.[90]   Once it was finally determined that plaintiff suffered from "froamen ovale" and "aortic stenosis," on June 23, 2009, Rudolph A. Altergott, M.D., performed PFO ('patent foraman ovale,' which is the closure of an opening in the heart) and aortic valve replacement surgery on plaintiff at Provena Medical Center.[91]

On June 26, 2009, several days following the aortic valve replacement surgery, plaintiff complained to Dr. Aijaz about blood found in his urine.[92] After performing a CT scan of his abdomen and pelvis on October 5, 2009, Thomas Burns, M.D. of Provena Medical Center determined that plaintiff had gross hematuria, or red blood cells, in his urine.[93] Following this new revelation, plaintiff was admitted to Provena Medical Center's operating room for a "cystoscopy

---

[87]R. at 498.
[88]R. at 410, 499.
[89]R. at 499.
[90]R. at 510.
[91]R. at 515, 533. "Aortic stenosis" means the abnormal narrowing of the opening between the aorta and the left ventricle of the heart. *See Attorney's Illustrated Medical Dictionary*, (1997) p. S65.
[92]R. at 546.
[93]R. at 543. "Hematuria" means the discharge of red blood cells in the urine. *See Attorney's Illustrated Medical Dictionary*, (1997) p. H11.

with fulguration of prostatic bleeding."[94]

Plaintiff was prescribed certain medication after the ALJ hearing, and prior to the ALJ's decision, for his aortic valve surgery and hematuria. Specifically, plaintiff was prescribed Norco, Warfarin Sodium, Coumadin and multivitamins by Dr. Aijaz.[95] The ALJ reviewed all notes presented by Dr. Aijaz.[96] The ALJ decision was handed down on October 29, 2009 and denied plaintiff's DIB request.

## E.    October 29, 2009 ALJ decision

In her decision dated October 29, 2009, the ALJ ruled that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act and thus not entitled to DIB or a period of disability.[97] The ALJ's decision followed a five-step sequential evaluation process for determining whether an individual is disabled.[98] At step one, the ALJ found that plaintiff has not engaged in any substantial gainful activity ("SGA") since October 31, 2006.[99] The ALJ then found at step two that plaintiff has a combination of medical impairments that are severe, which include aortic insufficiency and lumbar spondylolisthesis at L5-S1.[100]

Though she found that the plaintiff suffered from severe impairments, the ALJ concluded at step three that the plaintiff's combination of impairments did not meet or medically equal any of the criteria of an impairment listed in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1 as being so severe as to preclude any gainful activity because the plaintiff's back

---

[94]R. at 540. "Cystoscopy" means the visual examination of the interior of the bladder; "fulguration" means the destruction of tissues with a high frequency electric current. *See Attorney's Illustrated Medical Dictionary*, (1997) p. C99.
[95]R. at 549.
[96]R. at 15.
[97]R. at 18.
[98]*See* 20 C.F.R. §§ 404.15.20, 416.920.
[99]R. at 12.
[100]*Id.*

impairment did not demonstrate compromise of a nerve or the spinal cord.[101] With regards to the plaintiff's aortic insufficiency, the ALJ found that the evidence did not meet the listing 4.10 or any other cardiac listing.[102]

Next, the ALJ determined plaintiff's residual functional capacity ("RFC").[103] A claimant's RFC is used to determine his or her ability to engage in substantial gainful activity, both physical and mental, on a sustained basis despite limitation from impairments.[104] Considering the entire record, the ALJ found that plaintiff had the RFC to perform sedentary work. She noted that he could alternate between sitting and standing, can prepare his children for school, and that he had a license and can drive.[105] This conclusion was at odds with plaintiff's claim (as well as his treating physician's opinion) that plaintiff's pain precluded him from climbing, stooping, kneeling, crouching or crawling; occasionally reaching, walking, sitting and standing no longer than 2.5 hours; lifting a maximum of 5-10 pounds; carrying a maximum of 5-10 pounds; no pushing and or pulling.[106] Although the ALJ never directly addressed the most recent opinion from May 6, 2007 or the June 13, 2007 opinion of plaintiff's treating physician, Dr. Aijaz, the ALJ may have been referring to both when she opined that plaintiff's treating physician's opinion was "not supported by the medical evidence."[107] The ALJ found that while plaintiff's impairments could reasonably be expected to produce the symptoms he alleged, his statements about intensity, persistence, and the limiting effects of his symptoms were not entirely credible.[108] In support of this finding, the ALJ

---

[101]R.at 13.
[102]Id.
[103]Id.
[104]20 C.F.R. §404.1545(a)(1).
[105]R. at 16.
[106]R. at 465.
[107]R. at 462, 16.
[108]R. at 16.

noted that Dr. Aijaz's January 25, 2007, opinion released plaintiff back to work.[109]

Finally, having established plaintiff's RFC, the ALJ proceeded to step four and relied on the VE's testimony that plaintiff was not capable of performing his past relevant work as a forklift operator.[110]  However, the ALJ looked to step five and found that, as testified to by the VE in the hypothetical presented by the ALJ, plaintiff can perform sedentary work that exists in significant numbers in the national economy.[111]  As a result, given that plaintiff was able to work, the ALJ concluded that he was not disabled under sections 216(i) and 223(d) of the Social Security Act.[112]

## F.  Medical record: post-ALJ decision to present

On November 25, 2009, plaintiff visited Chris Kolyvas, M.D., at Heartland Cardiovascular Center, L.L.C. to discuss several episodes of diaphoria, dizziness, and heart irregularities.[113]  Dr. Kolyvas found that plaintiff has mild left ventricular dysfunction on an ECG and recommended that plaintiff carry with him an event monitor to record any heart irregularities.[114]

On December 16, 2009, plaintiff visited with Patrick O'Leary, M.D., regarding his chronic back pain in his right L5 region and found that plaintiff may need surgery due to isthimic spondylothesis at L5, "potential Grade II."[115]  As a result, Dr. Aijaz and Dr. O'Leary recommended a "Gill laminectomy at L5 and transforaminal lumbar fusion at L5-S1" to stabilize the spinal vertebra, which took place at Loyola University Health Center on February 21, 2010.[116]

As per Dr. Kolyvas' orders, plaintiff's heart was monitored between December 10, 2010 to

---

[109]*Id.*
[110]R. at 17.
[111]*Id.*
[112]R. at 18.
[113]R. at 554.
[114]R. at 555.
[115]R. at 560.
[116]R. at 562, 568. "Laminectomy" is defined as the surgical removal of the posterior arch of a vertebra. *See Attorney's Illustrated Medical Dictionary*, (1997) p. L5.

January 7, 2011.[117] Upon review and referral by Dr. Kolyvas, JoAnn Donoghue, D.O., determined that there was quite a bit of varying heart rates and he indicated that plaintiff may be suffering from supraventricular tachycardia, which means an abnormally fast heartbeat.[118]

These additional records were considered by the Social Security Administration's appeals council.[119]

## III.  STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[120]  The Court will uphold the ALJ's decision if it is supported by substantial evidence and is free of erroneous legal standards.[121]  Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion."[122]  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner (or ALJ), not the courts.[123]  Even so, the decision of the Commissioner is not entitled to unlimited judicial deference.[124]  The ALJ must consider all relevant evidence in the record, and may not select and discuss only that evidence that favors his or her ultimate conclusion.[125]  An ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability.  The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.

---

[117]R. at 590.
[118]*Id.* "Supraventricular" is defined as above the ventricle of the heart; "trachycardia" is defined as an abnormally fast heartbeat. *See Attorney's Illustrated Medical Dictionary*, (1997) p. T2.
[119]R. at 1, 4.
[120]*Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).
[121]*Rohan v. Carter*, 98 F.3d 966, 970 (7th Cir. 1996).
[122]*Id.* (*citing Edwards v. Sullivan*, 985F.2d 334, 336 (7th Cir. 1993)).
[123]*Herr v. Sullivan*, 912 F.2d 178,181 (7th Cir. 1990).
[124]*Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).
[125]*Herron v. Shalala*, 19 F3d 329, 333 (7th Cir. 1994).

## IV. ANALYSIS

In his brief, plaintiff argues that the ALJ's decision must be reversed or remanded because the ALJ erred by: (1) failing to accept new and material evidence supportive of plaintiff's claim, which was submitted to the Appeals Council after the ALJ's decision; (2) improperly analyzing plaintiff's credibility; and (3) improperly failing to consider the most recent opinion of the treating physician.

**A.    New and material evidence regarding the medical records must be considered on remand.**

Plaintiff argues that following the ALJ decision made on October 29, 2009, plaintiff submitted new and material evidence into the medical record that further supports his claim for disability.[126] Defendant believes that the additional evidence plaintiff has provided is not material.[127]

As required under a sentence six remand, a court can remand a case for further consideration so long as the additional evidence was not accessible by the ALJ prior to his or her decision.[128] Moreover, the plaintiff carries the burden of proving that the evidence is new, material and there was good cause as to why the evidence was not proffered to the ALJ prior to the decision.[129]    This additional evidence is considered "material" so long as there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered" and "if it is relevant to the claimant's condition during the relevant time period encompassed by the disability application under review." [130] If the claimant's impairment gets worse, the ALJ is "required to

---

[126]Pl.'s Mem. in Supp. of His Mot. for Summ. J. at 12.
[127]Def.'s Resp. to Pl.'s Mot. for Summ. J. at 12.
[128]42 U.S.C. § 405(g).
[129]*Id.*
[130]*Schmidt v. Barnhart*, 395 F.3d 737,742 (7th Cir. 2005).

examine the record further to determine the onset date."[131] If any subjective or objective evidence is presented prior to the ALJ's decision and "speaks to the...claimant's condition at or before the time of the administrative hearing," then the materiality requirement is met for any additional evidence presented after the ALJ decision.[132]

Plaintiff argues that directly correlating to his chronic back problem, Dr. Aijaz and Dr. O'Leary recommended a Gill laminectomy at L5 and transforaminal lumbar fusion at L5-S1 to stabilize the spinal vertebra on February 21, 2010.[133] The Commissioner, however, argues that the new evidence regarding the plaintiff's numerous lower back issues is immaterial to his disability application because plaintiff's impairment simply worsened, which requires plaintiff to file a new disability application. But the Commissioner agrees that the "laminectomy is related to the plaintiff's lower back pain during the period encompassed by the instant disability claim."[134] The Commissioner also acknowledges that plaintiff has spondylothesis at L5-S1 with facet arthropathy and possible left chronic spondylothesis.[135] Nonetheless, the Commissioner claims that plaintiff's back surgery four months after the period under consideration is evidence of new symptoms - or symptoms that had become more problematic - thus warranting a new application process.

The Commissioner then references *Getch v. Astrue,* but we find that it does not further support his immateriality argument.[136] In *Getch v. Astrue*, the court ruled that the claimant failed to provide new additional evidence that was material even after the Appeals Council reviewed the

---

[131]*Maisch v. Heckler*, 606 F. Supp. 982 (S.D.N.Y. 1985).

[132]*Getch v. Astrue*, 539 F.3d 473 (7th Cir. 2008).

[133]R. at 562, 568. "Laminectomy" means the surgical removal of the posterior arch of a vertebra. *See Attorney's Illustrated Medical Dictionary*, (1997) p. L5.

[134]Def.'s Resp. to Pl.'s Mot. for Summ. J. at 13.

[135]R. at 14.

[136]*Id.*

evidence because "it did not provide a basis for changing the ALJ's decision."[137]  The court also

noted, in citing *Schmidt v. Barnhart*, that medical evidence that "post-dates" the ALJ decision does

not meet the materiality requirement "unless it speaks to the patient's condition at or before the time

of the administrative hearing."[138]  Here, plaintiff and the Commissioner are in agreement that

plaintiff provided evidence of his chronic lower back pain, which was considered material by both

parties. Because the surgery appears to closely relate to the treatment plaintiff was receiving prior

to the ALJ's decision, we find that it is new and material objective evidence that is related to the

plaintiff's original DIB application. Therefore, the ALJ should consider this new and material

evidence on remand.

**B.      The ALJ improperly analyzed plaintiff's credibility.**

Plaintiff argues that the objective medical record does not support the ALJ's decision that

plaintiff has an RFC to perform sedentary work for two reasons: first, the ALJ used boilerplate

language in her assessment of plaintiff's RFC and, secondly, the ALJ failed to discuss the side

effects of plaintiff's medication. [139] The Commissioner believes that the ALJ made a concerted effort

to discuss and incorporate plaintiff's testimony and allegations regarding the limiting effects of his

symptoms into his RFC.[140]

The ALJ's decision included a paragraph that stated the following:

After careful consideration of the evidence, the undersigned finds that the claimant's
medically determinable impairments could reasonably be expected to cause the alleged
symptoms; however, the claimant's statements concerning the intensity, persistence and
limiting effects of these symptoms are not credible to the extent they are inconsistent with

---

[137]*Getch*, 539 F.3d at 484.
[138]*Id.* (*citing Schmidt*, 395 F.3d at 742.).
[139]Pl.'s Mem. in Supp. of His Mot. for Summ. J. at 8, 9.
[140]Def.'s Resp. to Pl.'s Mot. for Summ. J. at 3.

the above residual functional capacity assessment.[141]

Plaintiff contends that this is boilerplate language that is unsupported by the rest of the decision.[142]

The Seventh Circuit has rejected this type of language because it "yields no clue to what weight the trier of fact gave the testimony."[143]  But the more critical issue is whether there is a credibility analysis to support the ALJ's conclusion, regardless of whether boilerplate language was used.

It appears that the ALJ based her entire credibility analysis on only one note made by consulting physician Dr. Elgar, where he documented plaintiff's statements that he worked "heavy manual labor" rehabbing houses with his father-in-law, "shoveling dirt with his hands," and "working up a good sweat."[144]  At the ALJ hearing plaintiff specifically refuted Dr. Elgar's notes and stated that although he went with his father-in-law to the job site, he "wasn't doing no physical work or anything" because all he did was just sit there.[145] In her decision, the ALJ references Dr. Elgar's note and states that "claimant's performance of such strenuous activity as house rehabbing renders his testimony alleging disability and total inability to work less than credible."[146] Though the issue of rehabbing houses is relevant to plaintiff's credibility analysis, and may be a basis for discrediting him, the problem we have with the ALJ's analysis is that it begins and ends with only this one sentence referencing Dr. Elgar's one note.[147]

---

[141]R. at 16.

[142]Pl.'s Mem. in Supp. of His Mot. for Summ. J. at 8.

[143]*Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) as amended on reh'g in part (May 12, 2010); *see also Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (where the Seventh Circuit has determined that unacceptable boilerplate language used by an ALJ is stated in some variation of the following: "'the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms,...the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible....'").

[144]R. at 329.

[145]R. at 53-54.

[146]R. at 15.

[147]*See Goble v. Astrue*, 385 F. App'x 588, 592 (7th Cir. 2010)(finding that a "claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment" especially when the claimant must be off task due to specific limitations related to the disability.).

The Commissioner points to *Carter v. Astrue* to argue that the ALJ appropriately assessed the plaintiff's credibility and spent nearly "two-thirds of a page summarizing plaintiff's testimony and allegations."[148] This is true; the ALJ reviewed the plaintiff's testimony regarding his ability to perform basic household tasks, as well as his medical treatment and history.[149] But in *Carter*, the court held that the ALJ "thoroughly recounted and analyzed the opinions of each of Carter's numerous treating and examining physicians in her comprehensive opinion, acknowledged any conflicts, and cited her reasons for adopting one opinion over the other."[150] Unlike in *Carter*, here the ALJ did not delve into any type of credibility analysis beyond the one sentence that refers to the plaintiff's work rehabbing houses in July of 2007. The ALJ's discussion does not say what she believes and what she discredits. Therefore, regardless of whether the ALJ uses boilerplate language, the decision must have a clear discussion of the reasons why the ALJ reached her particular credibility finding.

Moving to plaintiff's claim that the ALJ did not properly consider the side effects of his medications, we note that the ALJ is not "required to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work."[151] The ALJ must, however, provide substantial evidence as to why this information was not considered.[152]

The ALJ mentions treatments of physical therapy and steroid injections for his lower back and left ankle.[153] The ALJ also noted plaintiff's Vicodin and water pills that had been discussed at

---

[148]Def.'s Resp. to Pl.'s Mot. for Summ. J. at 3; *Carter v. Astrue*, 413 F. App'x 899, 905-06 (7th Cir. 2011).
[149]R. at 14-15.
[150]*Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011).
[151]*Herron*, 19 F.3d at 335.
[152]*Id.*
[153]R. at 15.

the ALJ hearing.[154] The ALJ expressly stated on two separate occasions throughout her decision that the Vicodin caused the plaintiff to "feel sleepy."[155]  The ALJ made certain to mention the medications that were specifically addressed at the hearing and was not obligated to discuss any other medication in plaintiff's medical record.

## C.    The ALJ acknowledged the opinions of the treating physician.

Plaintiff argues that the ALJ erred at step three of the sequential evaluation because she failed to consider the most recent opinion of the treating physician, Dr. Aijaz, made on May 6, 2007.[156]  The Commissioner responds that contrary to plaintiff's claim, the ALJ was aware of the most recent opinion from Dr. Aijaz and referred to this opinion at the ALJ hearing and in the ALJ decision.[157]

In determining whether an individual is disabled, the ALJ "must consider all of the evidence and discuss significant evidence contrary to her ruling."[158]  Although the ALJ is not bound by any of the findings of the treating physician, they cannot "ignore these opinions and must explain the weight given to the opinions in their decisions."[159]

Contrary to what the plaintiff argues, we find that the ALJ sufficiently reviewed Dr. Aijaz's medical opinions.  The ALJ specifically states that "Dr. Aijaz's opinion regarding the claimant's inability to work is not supported by the medical evidence of record."[160]  Both of Dr. Aijaz's reports from May 6, 2007, and June 13, 2007,  prohibit plaintiff from returning to work.  Though those two

---

[154]R. at 14.
[155]R. at 14, 15.
[156]R. at 465.
[157]R. at 59,60.
[158]*Lauer*, 169 F.3d at 489 (*citing Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)).
[159]1996 WL 374180 (Social Security Administration), 2.
[160]R. at 16.

reports are not explicitly mentioned by date in the ALJ's decision, the ALJ did state that Dr. Aijaz "lacks the thorough understanding" of the social security regulations that is required to make a finding on "whether the claimant can return to work," because that decision is "reserved solely to the Commissioner."[161] The ALJ also stated that Dr. Aijaz's opinions were "conclusory" and provided "little explanation" to support plaintiff's claims.[162] These statements arguably refer to both reports by Dr. Aijaz, considering both of his reports include claims that plaintiff cannot return to work.

## V. CONCLUSION

For the reasons set above, the Court finds that the ALJ's October 29, 2009 decision is to be remanded for further review. We grant plaintiff's Motion for Summary Judgement [dkt.15] remanding the ALJ's final decision.

**IT IS SO ORDERED.**

**Date**: August 21, 2012                    _____

Susan E. Cox
U.S. Magistrate Judge

---

[161]R. at 15-16.
[162]R. at 16.